UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/02/2013
```

-------------------------------------------------------------------X
                                       :

KHALDIA EMANUEL, et al.,              :

                    Plaintiffs,      :          13 Civ. 1806 (JMF)

                                         :

          -v-                      :       OPINION AND ORDER

                                         :

LA TOYA S. GRIFFIN, et al.,          :

                                         :

                  Defendants.     :

                                         :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Plaintiffs Richard Emanuel and Khaldia Emanuel, individually and on behalf of their

infant children J.E. and Y.E. ("Plaintiffs"), bring this action against various parties involved in a

child abuse investigation that took place from March 2010 to June 2012.  Plaintiffs sue Latoya

Griffin,[1] a caseworker at the New York City Administration for Children's Services ("ACS");

Bertha Stallings, a caseworker at ACS; Cassandra Chandler, a supervisor at ACS; John

Mattingly, the former commissioner of ACS; Gena Diacomanolis, the Director of the New York

State Child Advocacy Resource and Consultation Center in Brooklyn New York ("CARC");

Detective Joe Sallustio, of the New York City Police Department; Dr. Donald J. Lewittes, a

psychologist licensed to practice in New York; and the City of New York ("Defendants").

Defendant Diacomanolis brings cross-claims for contribution and indemnification against all

other Defendants, including Dr. Lewittes.

---

[1]      "Latoya" is spelled "La Toya" in the Complaint.  The Court has adopted the spelling used
in Defendants' Answer.  (Docket No. 31).

Dr. Lewittes now moves to dismiss the Complaint and Diacomanolis's cross-claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons discussed below, the motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are taken from the Second Amended Complaint ("SAC") (Docket No. 25) and are assumed to be true for purposes of this motion.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

In March 2010, ACS opened an investigation into possible child abuse by Richard Emanuel ("Richard") of his two daughters, J.E. and Y.E.  (SAC ¶¶ 16-18).  At the time, J.E. and Y.E. were five and eight years old, respectively.  (*Id.* ¶ 18).  On March 16, 2010, as part of the investigation, Khaldia Emanuel ("Khaldia") — the children's mother, who was not living with Richard at the time — brought the two children to CARC, where Sallustio and Griffin interviewed the children outside of Khaldia's presence and without recording the interviews.  (*Id.* ¶¶ 5, 7, 21A, 22, 25, 29-30).  Griffin and Sallustio allegedly asked J.E. leading questions about her father's alleged sexual abuse, causing J.E. to draw a picture that J.E. later explained was a depiction of herself "putting lotion on her father."  (*Id.* ¶¶ 27-28).  Griffin and Sallustio also questioned Y.E., who stated that she had never seen her father's private parts and that her sister "wasn't telling the truth."  (*Id.* ¶ 30).  Sallustio and Griffin interviewed Khaldia separately.  (*Id.* ¶ 34).  During the course of this interview, Sallustio and Griffin instructed Khaldia to ask Richard to come to CARC the following day.  (*Id.* ¶¶ 35, 39).

On March 29, 2010, after interviewing Richard, ACS and Griffin filed a petition alleging that Richard had sexually abused J.E.  (*Id.* ¶ 50).  ACS obtained an *ex parte* order of protection against Richard on that same day, ordering him to stay away from his daughters.  (*Id.* ¶ 52).

Continuing its investigation, ACS ordered J.E. and Y.E. to attend sessions with Defendant Dr. Lewittes, who was hired by "ACS, CAC[,] and[/]or the City of New York" to assess whether the children displayed symptoms or behaviors characteristic of sexually abused children.  (*Id.* ¶¶ 48, 55).  Dr. Lewittes was not hired by the Family Court, and Defendants did not obtain a court order to require the evaluations.  (*Id.* ¶ 58).  The sessions with Dr. Lewittes began on April 12, 2010, and continued through November 3, 2010, when he completed a report and provided it to the other Defendants.  (*Id.* ¶¶ 71, 71A).  J.E. and Y.E. were allegedly "repeatedly traumatized" by the "unnecessary multiple interviews" that took place.  (*Id.* ¶ 59).  Further, Plaintiffs contend that the report was "contrary to the acceptable standards for evaluating child sexual abuse" (*id.* ¶¶ 49A, 71A), and that the preparation of the report "prolonged the pain and suffering of [Plaintiffs] by protracting the investigation."  (*Id.* ¶ 49).

Plaintiffs include in the SAC a lengthy discussion about Dr. Lewittes's role in another, unrelated child abuse proceeding in Bronx Family Court.  (*Id.* ¶¶ 73-76A).  According to Plaintiffs, the judge in that unrelated proceeding excluded Dr. Lewittes's testimony regarding the alleged sexual abuse of a child because Dr. Lewittes had (1) conducted the evaluative interviews in the presence of the child's mother (*id.* ¶¶ 74, 76); (2) failed to investigate any family history (*id.* ¶ 74D); (3) relied on hearsay statements (*id.* ¶ 74B); and (4) repeatedly asked the child leading questions.  (*Id.* ¶ 76).  The judge in that case apparently relied on a defense expert who testified that Dr. Lewittes had violated standard methodologies in his questioning of the child.  (*Id.* ¶ 74).  Plaintiffs allege that Dr. Lewittes employed this same flawed methodology when carrying out his evaluations of J.E. and Y.E.  (*Id.* ¶ 76A).

On June 29, 2010, Khaldia became sick, and was unable to pick her children up from school.  (*Id.* ¶ 66-67).  She therefore asked Richard to pick the children up, which he did

notwithstanding the protective order prohibiting him from seeing his daughters, and apparently brought them back to Khaldia's home.  (*Id.*).  When Griffin made an unannounced visit to Khaldia's home that day, she observed Richard, who was subsequently arrested for violating the Order of Protection that had been issued in March.  (*Id.* ¶¶ 66, 68).  ACS then modified its initial petition against Richard by adding neglect charges against Khaldia for failing to keep the children away from their father.  (*Id.* ¶ 69).

The charges against Richard and Khaldia went to trial in June 2011 in Kings County Family Court.  (*Id.* ¶¶ 80, 89).  Ultimately, ACS declined to call Dr. Lewittes as an expert witness at the trial.  (*Id.* ¶¶ 82, 86).  Thereafter, the Court dismissed both the neglect petition against Khaldia and the sexual abuse charges against Richard.  (*Id.* ¶¶ 81, 86).  The Court subsequently entered an interim stay prohibiting Richard from having unsupervised visits with J.E. and Y.E., pending an appeal to the Appellate Division, Second Department.  (*Id.* ¶ 87-89).  In June 2012, the Second Department affirmed the Family Court's order.  (*Id.* ¶ 89).

Plaintiffs allege that, by virtue of his actions in the course of the child abuse investigation, Dr. Lewittes violated their rights under both federal and state law.  Although far from a model of clarity, the SAC appears to assert claims, pursuant to Title 42, United States Code, Section 1983, for violations of the First, Fourth, and Fourteenth Amendments (SAC ¶¶ 1, 109, 111, 153-154, 184-85) and *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  (*Id.* ¶¶ 114-118).  Plaintiffs also claim that Dr. Lewittes committed state torts, including malicious prosecution (*id.* ¶¶ 137, 139-142), intentional interference with parental custody (*id.* ¶¶ 143-145, 180-183),[2] false imprisonment (*id.* ¶¶ 143-151, 176-179),[3]

---

[2]    To be precise, Plaintiffs allege that Defendants "unlawfully interfered with Plaintiffs' custody of their minor children," (SAC ¶ 144) and committed "custodial interference."  (*Id.*

medical malpractice (*id.* ¶¶ 161-170), and breach of a "special duty of care." (*Id.* ¶¶ 157-160).

Plaintiffs seek $8,000,000 in compensatory damages, plus interest, as well as attorneys' fees and

costs. (*Id.* at 49).

## DISCUSSION

### A. Legal Standards

As noted, Lewittes's motion is brought pursuant to Rules 12(b)(1) and 12(b)(6). A Rule

12(b)(1) motion challenges the court's subject-matter jurisdiction to hear the case. "A case is

properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district

court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663

F.3d 89, 94 (2d Cir. 2011) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d

Cir.2000)), *aff'd on other grounds*, 133 S.Ct. 721 (2013). In reviewing a motion to dismiss

under Rule 12(b)(1), a court "must take all facts alleged in the complaint as true and draw all

reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that

showing is not made by drawing from the pleadings inferences favorable to the party asserting

it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd on other grounds*,

130 S.Ct. 2869 (2010) (citations and internal quotation marks omitted). Moreover, a court "may

consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue,

---

¶¶ 180-83). The Court understands these allegations to raise a claim of intentional interference
with parental custody, a tort that has been recognized under New York law. *See Pittman v.
Grayson*, 149 F.3d 111, 121 (2d Cir. 1998) (collecting cases).

[3]      In the SAC, Plaintiffs style this cause of action as one for "unlawful imprisonment,"
which is a crime under New York law. *See* N.Y. Penal Law §§ 135.05, 135.10. Accordingly,
the Court treats the SAC as raising a claim of false imprisonment, a well-established tort under
New York law. *See, e.g.*, *Martinez v. City of Schenectady*, 97 N.Y. 2d 78, 85 (2001). Plaintiffs
also raise a claim for "false arrest," but "[i]n New York, the tort of false arrest is synonymous
with that of false imprisonment." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) (citing *Jacques
v. Sears, Roebuck & Co.*, 30 N.Y.2d 466, 473 (1972)).

but [the Court] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)).

By contrast, in reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

## B.  Subject-Matter Jurisdiction

It is well established that "federal courts are courts of limited jurisdiction and, as such, lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013) (internal quotation marks omitted). As a general matter, Congress has granted federal district courts original jurisdiction

6

over cases in which there is a federal question, *see* 28 U.S.C. § 1331, in certain cases between

citizens of different states, *see* 28 U.S.C. § 1332, and over state law claims in cases where the

district court has original jurisdiction and where the state law claims are "so related to claims in

the action within such original jurisdiction that they form part of the same case or controversy."

28 U.S.C. § 1367.  Here, Plaintiffs bring claims pursuant to Section 1983, thereby invoking the

Court's federal question jurisdiction, and, by extension, supplemental jurisdiction over their state

law claims.  (SAC ¶ 3; Pls.' Mem. 9-13 (Docket No. 34)).  Dr. Lewittes, however, challenges the

Court's jurisdiction on the ground that it is barred by the "domestic relations exception" to

subject-matter jurisdiction.  (Def.'s Mem. 12-14 (Docket No. 29)).

 This argument is without merit.  "[T]he domestic relations exception . . . divests the

federal courts of power to issue divorce, alimony, and child custody decrees."  *Ankenbrandt v.*

*Richards*, 504 U.S. 689, 703 (1992).  The domestic relations exception applies even to state law

tort claims seeking monetary damages if the claim at issue "begin[s] and end[s] in a domestic

dispute."  *Schottel v. Kutyba*, No. 06-1577-cv, 2009 WL 230106, at *1 (2d Cir. Feb. 2, 2009)

(summary order).  The exception is motivated by considerations of judicial economy, as "federal

courts . . . lack the close association with state and local government organizations dedicated to

handling issues that arise out of [domestic disputes]," and considerations of judicial expertise,

given the "special proficiency developed by state tribunals" in these types of cases.

*Ankenbrandt*, 504 U.S. at 704.

 Lewittes argues that the exception applies here because "the instant dispute arises from a

Family Court proceeding and the plaintiffs seek redress which was otherwise available to them in

the Family Court."  (Def.'s Mem. 13).  The domestic relations exception, however, does not

apply to every case in which plaintiffs seek redress in federal court that was otherwise available

in family court.  Instead, the exception applies where a plaintiff "rewrit[es] a domestic dispute as a tort claim for monetary damages."  *Schottel*, at *1.  In *Schottel*, the plaintiff sought monetary damages for alleged fraud and coercion that took place in divorce proceedings that allegedly deprived her of her custody and visitation rights.  *Id.*  Although the plaintiff sought only monetary damages for her harms, the exception applied because "her tort claim . . . [was], at heart, a dispute surrounding the custody of her child."  *Id.*

At heart, however, this case is not a dispute about custody.  Richard and Khaldia ultimately retained custody over their children, and they are not seeking to have this Court "re-examine [or] re-interpret . . . the evidence brought before the state court in the domestic relations proceedings."  *McArthur v. Bell*, 788 F. Supp. 706, 709 (E.D.N.Y. 1992).  Instead, the dispute here primarily concerns the manner in which Dr. Lewittes conducted the interviews of J.E. and Y.E., arguably prolonging the state court proceedings and inflicting emotional harm on the children and their parents.  These issues are wholly separate from the substance of the custody proceedings, and there is no risk that, by deciding these issues, the Court will be forced to "meddle in issues of child custody," as Dr. Lewittes claims.  (Def.'s Mem. 13.).  Ultimately, while the claims against Dr. Lewittes "originate from the disputed custody proceedings, they are distinct from the domestic relationship."  *McKnight v. Middleton*, 699 F. Supp. 2d 507, 519 (E.D.N.Y. 2010), *aff'd*, 434 F. App'x 32 (2d Cir. 2011) (holding that the domestic relations exception did not apply to claims challenging the constitutionality of a family court's custody order, family court proceedings, and the New York Domestic Relations Law) (internal quotation marks and citations omitted); *see also Ankenbrandt*, 504 U.S. at 704 (holding that the domestic relations exception did not apply where plaintiff brought suit on behalf of her daughters for

alleged sexual and physical abuse, and the lawsuit did not seek the "issuance of a divorce, alimony, or child custody decree").  Accordingly, the Court has jurisdiction.

## C.  Section 1983 Claims

Section 1983 extends only to state action; in other words, it prohibits only conduct that is "committed by a person acting under color of state law."  *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).  "A private person — not a government official — acts under color of state law for purposes of § 1983 when 'he has acted together with or has obtained significant aid from state officials' or because his conduct is otherwise chargeable to the state."  *Barrett v. Harwood*, 189 F.3d 297, 304 (2d Cir. 1999) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).  The mere fact that a private actor is paid by state funds, or is hired by a state actor, is insufficient to establish state action. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982); *Young v. Halle Hous. Assocs., L.P.*, 152 F. Supp. 2d 355, 362 (S.D.N.Y. 2001).  Private actors, however, may also be found liable under a Section 1983 conspiracy theory when the plaintiff demonstrates "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002).

Dr. Lewittes's conduct does not qualify as state action, nor have Plaintiffs adequately alleged a Section 1983 conspiracy.  As an initial matter, there is no question that Dr. Lewittes is a private person, and the mere fact that he was hired by ACS is insufficient to transform his actions into those of the state.  *See Koltz v. Bezmen*, 822 F. Supp. 114, 116-18 (E.D.N.Y. 1993) (finding no state action by a social worker who had been requested by the Department of Social Services to conduct tests to determine whether children had been sexually abused).  Further,

while Plaintiffs contend that Dr. Lewittes should be found liable under a conspiracy theory (Pls.'
Mem. 6), the SAC fails to allege any facts supporting the existence of an actual agreement to
inflict unconstitutional injuries.  Plaintiffs assert, in conclusory fashion, that Lewittes was
"acting in concert with the City defendants" (Pls.' Mem. 7), and the SAC notes that Dr. Lewittes
was hired by the City defendants.  (SAC ¶ 48).  But neither of these allegations — either by
themselves or together — is sufficient to state a claim for Section 1983 conspiracy liability.

Plaintiffs put forth a final, but similarly unpersuasive, theory for Section 1983 liability
against Dr. Lewittes: *Monell* liability.  (Pls.' Mem. 8-9).  *Monell* permits Section 1983 suits
against municipalities when an unconstitutional injury is inflicted by virtue of the municipality's
"policy or custom."  *Id* at 694.  But *Monell* liability fails here for a simple reason: Dr. Lewittes is
not a municipality or even the agent of one.  Although *Monell* permits the imposition of liability
on municipalities on account of the *actions* of their agents, *see Pembaur v. City of Cincinnati*,
475 U.S. 469, 481-83 (1986), liability in such cases ultimately flows to the municipality itself,
not the agent.  Indeed, the very innovation of *Monell* was to permit liability against
municipalities under Section 1983; *Monroe v. Pape*, 365 U.S. 167 (1961), which *Monell* partially
overturned, had previously held that municipalities were immune from suit under Section 1983.
*See Monell*, 436 U.S. at 662-63.  Individual liability under Section 1983 is governed by an
entirely different set of principles — one of which, state action, ultimately forecloses liability
against Dr. Lewittes for the reasons discussed above.  Therefore, all of Plaintiffs' Section 1983
claims against Dr. Lewittes must be and are dismissed.

**D.  State Law Claims**

The Court turns then to Plaintiffs' state law claims against Dr. Lewittes.  Dr. Lewittes
argues first that the Court lacks or, in the alternative, should decline to exercise supplemental

jurisdiction over the state law claims.  He further argues that the state law claims fail as a matter of law.  The Court will address each argument in turn.

### 1.  Supplemental Jurisdiction

Although Dr. Lewittes argues that the Court should not exercise jurisdiction over these claims, the Court disagrees.  First, the Court is not, as Dr. Lewittes contends (Def.'s Mem. 18-19), barred from exercising supplemental jurisdiction by *Cushing v. Moore*, 970 F.2d 1103 (2d Cir. 1992).  *Cushing* holds that a federal court may not exercise supplemental jurisdiction over state law claims unless there is a proper basis for original federal jurisdiction.  *Id.* at 1106.  But, as discussed above, there is federal jurisdiction here.  The Court therefore has discretion to exercise supplemental jurisdiction over state law claims to the extent that the state law claims are so related to the federal claims that "they form part of the same case or controversy."  28 U.S.C. § 1367(a); *see also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 ("A state law claim forms part of the same controversy if it and the federal claim derive from a common nucleus of operative fact." (internal quotation marks omitted)).  Here, the state law claims are so related and, in light of the fact that the case would proceed in this Court with respect to the other Defendants, there is good reason to exercise supplemental jurisdiction.  *See, e.g.*, *Stokes v. City of Mount Vernon, N.Y.*, No. 11 Civ. 7675 (VB), 2013 WL 1222720, at *1-2 (S.D.N.Y. Mar. 25, 2013) (exercising supplemental jurisdiction over state law claims against individual defendants because the state claims "ar[o]se from the same common nucleus of operative fact" as the remaining federal claim against a municipal defendant (internal quotation marks omitted)); *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 434-35 (S.D.N.Y. 2012) (exercising supplemental jurisdiction when certain federal claims were dismissed because "pendent state law claims . . . [were] sufficiently related to the remaining" federal claims against other defendants).

11

### 2.  Malicious Prosecution

Next, Dr. Lewittes moves to dismiss Plaintiffs' malicious prosecution claim.  Under New York law, to state a claim for malicious prosecution, a plaintiff must allege "(1) the commencement or continuation of a . . . proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the . . . proceeding and (4) actual malice."  *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000). Malicious prosecution claims can arise out of civil as well as criminal proceedings.  *See, e.g.*, *Perryman v. Vill. of Saranac Lake*, 41 A.D.3d 1080, 1081 (N.Y. App. Div. 2007).

Dr. Lewittes argues that because he was hired after ACS filed its petition against Richard and Khaldia, the malicious prosecution claim must be dismissed, presumably because he could not have been responsible for the commencement of the proceedings.  (Def.'s Mem. 19).  This argument falls short, however, for two reasons.  First, while it is true that Dr. Lewittes was hired on April 4, 2010 (SAC ¶ 60) — after the filing of the petition against Richard on March 29, 2010 (SAC ¶ 50) — the petition was not amended to include charges against Khaldia until August 2010 (SAC ¶ 69).  Second, and more fundamentally, malicious prosecution liability can be based either on the "commencement" or "continuation" of proceedings.  *Smith-Hunter*, 95 N.Y.2d at 195.  Even if he is not responsible for commencement of the proceedings against the parents, therefore, Dr. Lewittes could still be held responsible for their continuation.

More challenging to Plaintiffs' claim, however, is that it was ACS, and not Dr. Lewittes, who was primarily in control of the Family Court action.  The fact that Dr. Lewittes did not control the proceedings is not dispositive, however, as individuals other than the agent who actually prosecutes the action can be held liable for malicious prosecution.  *See Mesiti v. Wegman*, 307 A.D.2d 339 (N.Y. App. Div. 2003) (affirming malicious prosecution judgment

12

against individual who informed police about traffic accident, resulting in plaintiff being prosecuted under New York traffic law). An individual not in control of the prosecution may be held liable for malicious prosecution if he or she "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (quoting *DeFilippo v. Cnty. of Nassau*, 183 A.D.2d 695, 696 (N.Y. App. Div. 1992). Under this formulation, the Second Department has held that one can be held liable for malicious prosecution by giving false information to authorities if "at the time the information was provided, the defendant knew it to be false." *Lupski v. Cnty. of Nassau*, 32 A.D.3d 997, 998 (N.Y. App. Div. 2006).

Here, Plaintiffs have alleged sufficient detail to suggest that Dr. Lewittes knowingly provided false information to ACS. In particular, Plaintiffs allege that Dr. Lewittes "knew or should have know[n] that he had not documented evidence of child sexual abuse, yet he published statements that [ACS] used to" maintain the proceedings against Plaintiffs. (SAC ¶ 49B). Although this statement, by itself, may lack sufficient detail to satisfy *Twombly*'s plausibility requirement, other allegations in the SAC bolster this claim. For example, the SAC asserts that Dr. Lewittes "had a history of deviating from acceptable practices as a psychologist evaluating child abuse" (*id.* ¶ 56); that he had been criticized for using unreliable procedures in other proceedings (*id.* ¶¶ 73-76); and that he used a flawed methodology in the interviews of Y.E. and J.E. (*id.* ¶ 76A), by having the mother present during the interviews (*id.* ¶¶ 74, 74A), failing to investigate family history (*id.* ¶¶ 76, 76A), and asking leading questions. (*Id.*).

These allegations are similar to those in *Estiverne v. Esernio-Jenssen*, 581 F. Supp. 2d 335 (E.D.N.Y. 2008), where the Court permitted a malicious prosecution claim to proceed against a doctor who had allegedly made a false child abuse report. In that case, the plaintiffs

13

asserted that the doctor's diagnosis of child abuse was not supported by medical evidence, that the diagnosis was disputed by a colleague, and that the doctor had a reputation for falsifying diagnoses of child abuse.  *Id.* at 347.  The Court held that the "plaintiffs' allegation that [the doctor] knew her report . . . was false at the time she made it . . . would be sufficient to support a malicious prosecution claim."  *Id.* at 348.  Similarly, Plaintiffs here have alleged sufficient facts to show more than a sheer possibility that Dr. Lewittes knew his report was false when he provided it to ACS.

Plaintiffs' allegations easily satisfy the other requirements for a malicious prosecution claim.  As for the second element — the termination of proceedings in favor of plaintiffs — the proceeding here did indeed terminate in Plaintiffs' favor .  (SAC ¶¶ 81, 86, 89).  The third element, lack of probable cause, requires the plaintiff to allege that there were no "facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty."  *Perryman*, 41 A.D.3d at 1081.  "Because obviously less in the way of grounds for belief will be required to justify a reasonable [person] in bringing a civil rather than a criminal suit, when the underlying action is civil in nature the want of probable cause must be patent."  *Fink v. Shawangunk Conservancy, Inc.*, 15 A.D.3d 754, 755 (N.Y. App. Div. 2005) (internal quotation marks omitted).  As discussed above, Plaintiffs allege facts suggesting that Dr. Lewittes conducted a deficient and unreliable investigation into the allegations of child abuse; this suffices to allege a lack of probable cause.  And the pleadings satisfy the fourth element, actual malice, because "lack of probable cause generally raises an inference of malice." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997); *see also Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc.*, No. 99 Civ. 4677 (WK), 2002 WL 737477, at *11 (S.D.N.Y. Apr. 25, 2002).  Accordingly, Lewittes's motion to dismiss this claim is denied.

### 3.   Intentional Interference with Parental Custody

As noted, Plaintiffs also appear to bring a claim for intentional interference with parental custody, which some New York courts have recognized as a tort.  Although the "contours of a tort cause of action for interference with parental custody under New York law are far from clear," *Pittman*, 149 F.3d at 120, the tort has been referred to as "very narrow," *Casivant v. Greene Cnty. Cmty. Action Agency*, 234 A.D.2d 818, 819 (N.Y. App. Div. 1996).  In particular, "cases upholding the existence of this tort have involved violent abduction, willful disobedience of a court custody order, and wrongful detention."  *Id.* (internal quotation marks omitted); *see, e.g.*, *Lisker v. City of New York*, 338 N.Y.S.2d 359 (N.Y. Sup. Ct. 1972); *McGrady v. Rosenbaum*, 308 N.Y.S.2d 181 (N.Y. Sup. Ct. 1970), *aff'd*, 324 N.Y.S.2d 876 (1st Dep't 1971).

The facts as alleged by Plaintiffs fall far short of meeting the requirements for this tort. Plaintiffs do not allege any sort of violence, or violation of a court custody order, by Dr. Lewittes.  And although Plaintiffs contend that the manner in which Dr. Lewittes carried out the interviews was faulty (SAC ¶¶ 73-76) and traumatizing to the children (*id.* ¶ 59), they make no factual allegations to suggest that he wrongfully kept the children away from their parents. Richard, meanwhile, was kept away from the children by virtue of the order of protection that was issued before Dr. Lewittes was hired.  (*Id.* ¶ 52, 60).  And there are no indications that Dr. Lewittes kept the children away from Khaldia; in fact, one of Plaintiffs' principal concerns with the method by which Dr. Lewittes carried out the interviews was that Khaldia was *present* during the interviews.  (*Id.* ¶¶ 75-76).  Although this may, as Plaintiffs allege, have "taint[ed] the integrity of the interview" (*id.* ¶ 76), it is fatal to any claim of intentional interference with parental custody on behalf of Khaldia.  Dr. Lewittes's motion to dismiss this claim is therefore granted.

15

### 4.  False Imprisonment

Plaintiffs' next claims — for unlawful imprisonment — fail against Dr. Lewittes for similar reasons.  Under New York law, the elements of false imprisonment are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (internal quotation marks omitted).  Here, no claim for false imprisonment can be sustained on behalf of Richard because Plaintiffs do not allege that Dr. Lewittes interacted with, let alone detained, him.  And although Dr. Lewittes did interact with Khaldia and the two children, the SAC fails to allege any facts suggesting that Dr. Lewittes took actions that would have led them to believe that they were detained or not "free to leave."  *Arrington v. Liz Claiborne, Inc.*, 260 A.D.2d 267, 267-68 (N.Y. App. Div. 1999); s*ee Cecora v. De La Hoya*, 106 A.D.3d 565, 566 (N.Y. App. Div. 2013) (affirming a decision to dismiss a claim of false imprisonment where nothing in the complaint suggested that the defendant had done anything to lead the plaintiff to believe that she could not leave).  Plaintiffs' false imprisonment claims against Dr. Lewittes are therefore dismissed.

### 5.  Medical Malpractice and Breach of the Special Duty of Care

Finally, Plaintiffs claim that Dr. Lewittes is liable for medical malpractice and for violating a "special duty of care" toward them.  In particular, Plaintiffs allege that the evaluations were "traumatizing" to the children (SAC ¶¶ 59, 163), and that Dr. Lewittes "deviated from good and accepted practices."  (SAC ¶ 163).

For a medical malpractice claim, "[i]t has long been recognized that, as a general rule, the sine qua non . . . is the existence of a doctor-patient relationship."  *Fox v. Marshall*, 88 A.D.3d 131, 138 (N.Y. App. Div. 2011).  As a physician's duty of care is "ordinarily one owed to his or

her patient," *Purdy v. Pub. Adm'r of Cnty. of Westchester*, 72 N.Y.2d 1, 9 (1988), "the element of duty [that is required for a medical malpractice claim] would normally be missing from a claim made against a doctor by one who is not that doctor's patient," *Fox* at 138.  In certain situations, however, a physician's duty can "encompass nonpatients who have a special relationship with . . . the physician."  *McNulty v. City of New York*, 100 N.Y.2d 227, 233 (2003).  In particular, a doctor who performs an independent medical evaluation can be held liable for medical malpractice based on "physical harm to the examinee," but cannot be held so liable for "damages resulting from the conclusions the physician reaches or reports."  *Bazakos v. Lewis*, 12 N.Y.3d 631, 635 (N.Y. 2009) (internal quotation marks omitted) (quoting *Dyer v. Trachtman*, 470 Mich. 45, 49-50 (2004)); *see also Bloch v. Gerdis*, No. 10 Civ. 5144 (PKC), 2011 WL 6003928, at *4 (S.D.N.Y. Nov. 30, 2011).

Here, the allegations in the SAC do not support the existence of a full-fledged physician-patient relationship between Dr. Lewittes and any of the Plaintiffs.  Instead, "the relationship between a doctor performing an [independent medical examination as a litigation support service] and the person he is examining may fairly be called a 'limited physician-patient relationship.'"  *Bazakos*, 12 N.Y.3d at 635.  Such a relationship, as noted above, gives rise to a limited set of duties; specifically, the doctor must not "cause physical harm to the examinee."  *Id.* Nowhere in the SAC, however, do Plaintiffs allege that Dr. Lewittes physically harmed them.  At most, Plaintiffs state that Dr. Lewittes "traumatized" the children.  (SAC ¶ 59).  The SAC does not elaborate on how this trauma manifested itself, and Plaintiffs do not contend that any physical harm resulted from the evaluations.  Although the SAC does, of course, challenge the validity of Dr. Lewittes's techniques and the accuracy of his conclusions, *Bazakos* makes clear that the limited relationship between a doctor performing an independent medical examination as

17

a litigation support service and the subject of such an examination does not give rise to a medical malpractice action based on "the conclusions the physicians reaches or reports." *Bazakos*, 12 N.Y.3d at 635.  Thus, Plaintiffs' claims for medical malpractice against Dr. Lewittes fail.

Plaintiffs' claim that Dr. Lewittes owed and violated a "special duty of care" toward them fails for largely the same reasons.  As noted above, a physician generally does not owe a duty beyond the "one owed to his or her patient," *Purdy*, 72 N.Y.2d at 9, and Plaintiffs here identify no source of a "special duty" owed by Dr. Lewittes other than his status as a doctor employed to evaluate whether the children exhibited symptoms of child abuse.  (SAC ¶ 55).  In the absence of any other source of a "special duty of care," Dr. Lewittes's motion to dismiss this claim is therefore granted.

### E.  Defendant Diacomanolis's Cross-Claims for Contribution and Indemnification

As noted, Defendant Diacomanolis also asserts cross-claims against all other Defendants, including Dr. Lewittes, for contribution and indemnification.  (Answer to Am. Compl., ¶¶ 75-76 (Docket No. 11)).  Dr. Lewittes moves to dismiss these cross-claims.  (*See* Am. Notice Mot. to Dismiss 2 (Docket No. 27); Def.'s Mem. 21).  The Court will address his motion, even though Diacomanolis has not filed any opposition.  *See, e.g.*, *Haas v. Commerce Bank*, 497 F. Supp. 2d 563, 564-65 (S.D.N.Y. 2007) (reviewing the legal sufficiency of complaint even though plaintiff filed no opposition to defendant's motion to dismiss).

The Court grants Dr. Lewittes's motion, except to the extent it seeks dismissal of the cross-claim for contribution relating to Plaintiffs' malicious prosecution claim.  A claim for indemnification arises by virtue of "some relationship with the tortfeasor or obligation imposed by law," *Glaser v. M. Fortunoff of Westbury Corp.*, 71 N.Y.2d 643, 646 (1988), but Diacomanolis has not alleged the existence of any such relationship with Dr. Lewittes.  A

18

tortfeasor may bring an action for contribution against another tortfeasor, on the other hand, if

the two are "subject to liability for damages for the same personal injury."   N.Y. C.P.L.R.

§ 1401.  Such an action may be brought against an intentional tortfeasor, *see Bd. of Educ. of*

*Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley,* 71 N.Y.2d 21, 27 (1987), and

may be brought "whether or not . . . a judgment has been rendered against the person from whom

contribution is sought," N.Y. C.P.L.R. § 1401.  To the extent that the Court has dismissed the

claims against Dr. Lewittes, the cross-claims for contribution plainly fail as a matter of law.  At

this stage of the litigation, however, both Dr. Lewittes and Diacomanolis are potentially liable

for damages from Plaintiffs' malicious prosecution claim.  Accordingly, Diacomanolis's

contribution claim survives with respect to that one cause of action.

## CONCLUSION

For the foregoing reasons, Lewittes's motion to dismiss is GRANTED in part and

DENIED in part.  All of Plaintiffs' federal law claims against Dr. Lewittes are dismissed, and all

of Plaintiffs' state law claims against Dr. Lewittes are dismissed, with the exception of their

malicious prosecution claim.  Defendant Diacomanolis's cross-claims against Dr. Lewittes for

indemnification and contribution are also dismissed, except to the extent they seek contribution

with respect to Plaintiffs' malicious prosecution claim.

The Clerk of Court is directed to terminate Docket No. 27.

SO ORDERED.

Dated: October 2, 2013
       New York, New York

JESSE M. FURMAN
United States District Judge

19