UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  03/25/2015
```

--------------------------------------------------------------------X
KHALDIA EMANUEL, et al.,                         :
                                                 :
                            Plaintiffs,          :
                                                 :
                -v-                              :
                                                 :
LA TOYA S. GRIFFIN, et al.,                      :
                                                 :
                            Defendants.          :
                                                 :
--------------------------------------------------------------------X

13-CV-1806 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

Plaintiffs Richard and Khaldia Emanuel, individually and on behalf of their minor

children, Y.E. and J.E., bring suit against New York City, various city employees, and Dr.

Donald Lewittes (collectively, "Defendants"), alleging claims, pursuant to Title 42, United States

Code, Section 1983 and New York state law, arising from an investigation by the New York City

Administration for Children's Services ("ACS") into child abuse and neglect in which the

individual Defendants participated.  Defendants now move for summary judgment on all of

Plaintiffs' claims, and move to strike some or all of Plaintiffs' submissions in opposition or, in

the alternative, for sanctions.  For the reasons stated below, Defendants' summary judgment

motions are granted and the Second Amended Complaint ("SAC" or "Complaint") is dismissed

in its entirety.  Defendants' motion to strike is denied as moot to the extent they seek to strike

Plaintiffs' submissions, but granted to the extent that they seek sanctions.

## PLAINTIFFS' SUMMARY JUDGMENT SUBMISSIONS

Before turning to Defendants' motions, the Court must address the latest deficient filings

by Plaintiffs' attorney.  Local Rule 56.1 requires that, "[u]pon any motion for summary judgment

pursuant to Rule 56 . . . , there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  A memorandum opposing summary judgment must, in turn, be accompanied by a corresponding statement "responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  The Rule requires more than a rote recitation of facts.  Specifically, "each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Local Civ. R. 56.1(d); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (stating that the party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and "designat[ing] 'specific facts showing that there is a genuine issue for trial'" (quoting Fed. R. Civ. P. 56(e))).

Plaintiffs' Rule 56.1 statement fails to comply with these requirements.  The vast majority of Plaintiffs' responses are devoid of citations to the record or contain only general references to a document with no indication as to which part of the document is relevant or how the document supports the proposition for which it is cited.  (*See, e.g.*, Opp'n 56.1 Statement (Docket No. 117) ("Pls.' 56.1") ¶¶ C5, C10, C11, C16, C17, C26, D5, L1, L3).  In addition, Plaintiffs' Rule 56.1 statement routinely recites facts that are irrelevant to the paragraph of Defendants' statement to which they ostensibly correspond and, just as often, engages in inappropriate legal argument.  (*See, e.g.*, *id.* ¶¶ C5, C11, C12, C14, C17, C18, C23, C26, C45, C51, D5, D19, D20, D35, L3).  *See Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y.

2012) ("[T]he [Rule 56.1] Statement improperly interjects arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts."); *Tsai v. Rockefeller Univ.*, No. 00-CV-329 (SAS), 2002 WL 237843, at *1 n.1 (S.D.N.Y. Feb. 15, 2002) ("Plaintiff's Rule 56.1 Statement is also deficient in that it often contains long narratives and conclusions which are not supported with citations to admissible evidence."), *aff'd sub nom. Li-Lan Tsai v. Rockefeller Univ.*, 46 F. App'x 657 (2d Cir. 2002).

Separate and apart from those flagrant violations of the Local Rules, Plaintiffs' Rule 56.1 statement is, in many parts, nonsensical or impossible to follow. Many of Plaintiffs' responses to Defendants' statements of fact appear to be notes Plaintiffs' counsel wrote himself or stream-of-consciousness reactions to Defendants' statements. (*See, e.g.*, Pls.' 56.1 ¶ C13 ("The conflict between policy criminality probable cause and ACS to assess and protect children to develop an appropriate plan. Describe the tensions about that. Gena Diacomanolis had a requirement to reconcile those conflicts and that they ultimately with the input of the District Attorney's Office and the police refused to videotape despite having all of the equipment available there."); *id.* ¶ C17 ("The questioning itself was supposed to have been done according to the directives by ACS first and then bring in the detective. But that somehow got changed without there being properly a notation of why or how. Also note taking and Gary Melton's argument about what the problem is. It is never accurate even when it is a verbatim transcript compared to videotaping. It is clear that it was leading."); *id.* ¶ C19 ("The climate of fear, intimidation at the developmental age of J.E. left her vulnerable to the body language and 'mean man' demeanor that she was so sweetly trying to comply with what it was that she figured out that he wanted her to say."); *id.* ¶ D5 ("While ACS has a responsibility (18 NYCRR Section CITE**) and the police also have an obligation to check the reliability of the source, the known fact that various types of

sources have greater or lesser reliability (see, Sallustio's testimony and Griffin's testimony).").
As a result, substantial portions of Plaintiffs' Rule 56.1 statement would be of little use to the
Court, even if it otherwise conformed to the Court's Local Rules.

The Court has considerable discretion in fashioning a remedy to address Plaintiffs' failure
to submit a Rule 56.1 statement in conformity with the Local Rules, including striking the
statement altogether and deeming admitted all facts in Defendants' Rule 56.1 statements.  *See,
e.g.*, *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001); *Durant v. A.C.S. State & Local
Solutions Inc.*, 460 F. Supp. 2d 492, 494 (S.D.N.Y. 2006); *see also Amnesty Am. v. Town of W.
Hartford*, 288 F.3d 467, 471 (2d Cir. 2002) (suggesting that a local rule requiring citations for all
Rule 56.1 statements provided litigants sufficient notice of that requirement that courts could
grant summary judgment on the basis that the plaintiff's Rule 56.1 submission lacked citations).
Nevertheless, the Court determines that such a drastic remedy would not serve the interests of
justice.  Instead, in deciding Defendants' motions for summary judgment, the Court will ignore
all portions of Plaintiffs' Rule 56.1 Statement that contain "improper legal argument and
unsupported assertions."  *Chenette v. Kenneth Cole Prods., Inc.*, No. 05-CV-4849 (DLC), 2008
WL 3176088, at *7 n.8 (S.D.N.Y. Aug. 6, 2008); *Am. Med. Ass'n v. United HealthCare Corp.,*
No. 00-CV-2800 (LMM), 2007 WL 1771498, at *2 (S.D.N.Y. June 18, 2007) ("When parties
decline to file Rule 56.1 statements, or when the statements they file lack citations or are in some
other way deficient, courts are 'free to disregard' the assertions therein." (citing *Holtz*, 258 F.3d
at 73)).  In addition, the Court will deem admitted those portions of Defendants' Rule 56.1
statements to which Plaintiffs fail to respond or for which Plaintiffs fail to include a reference to
competent evidence.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014); *Blackmon v.
UNITEA*, No. 03-CV-9214 (GWG), 2005 WL 2038482, at *2 (S.D.N.Y. Aug. 25, 2005)

(deeming admitted statements not supported by citations to competent evidence); *see also Guarino v. St. John Fisher Coll.*, 553 F. Supp. 2d 252, 254 (W.D.N.Y. 2008) (deeming admitted facts to which the plaintiff responded with legal arguments rather than competent evidence), *aff'd*, 321 F. App'x 55 (2d Cir. 2009).  Where Plaintiffs provide at least *some* citation in support of their statements, the Court — mindful of its duty at the summary judgment stage to construe the facts in the light most favorable to the non-movant — will undertake its own review of the record referenced by Plaintiffs in an effort to determine whether that evidence is sufficient to raise a genuine question of material fact.  *See id.* at 254.

## FACTS

With that background in mind, the following facts — drawn from the admissible materials submitted by the parties — are undisputed except where noted.  *See, e.g.*, *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).[1]

---

[1]   Plaintiffs seek an adverse inference based on the fact that several Defendants allegedly deleted or failed to turn over information to which Plaintiffs claim they were entitled, including e-mails, notes, and videotapes.  (Pls.' Mem. 29-37).  "[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *see also Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001) (stating that the moving party bears the burden of establishing that the requirements for an adverse inference are met).  Here, however, Plaintiffs fall far short of meeting that burden as they provide nothing more than conclusory assertions that the evidence they seek ever existed, that it was in fact destroyed by Defendants, or that Defendants destroyed the evidence with a "culpable state of mind."  *Id.* at 109; *see Morgenstern v. Cnty. of Nassau*, No. 04-CV-0058 (JS) (ARL), 2008 WL 4449335, at *7 n.3 (E.D.N.Y. Sept. 29, 2008) ("It is entirely unclear that any relevant [evidence] w[as] destroyed, and therefore the Court cannot deny summary judgment based on spoliation"); *Alaimo v. Trans World Airlines, Inc.*, No. 00-CV-3906 (GBD), 2005 WL 267558, at *3 (S.D.N.Y. Feb. 3, 2005) (similar).  Accordingly, Plaintiffs' request for an adverse inference is denied.

**A.  The Initial Report and Investigation**

Richard and Khaldia Emanuel are the divorced parents of minor children Y.E. and J.E.,

ages, currently thirteen and ten years old, respectively.  (Pls.' 56.1 ¶ C1; Dantowitz Decl. Supp.

C[]ity Defs.' Mot. Summ. J. (Docket No. 108) ("Dantowitz Decl."), Ex. H ("Initial Pet.") at 5).

Khaldia has custody of the children, but Richard has rights of access.  (Pls.' 56.1 ¶ C2).  On

March 11, 2010, a caller — whose name is redacted from the relevant documents — reported to

the New York State Central Registry of the Office of Children and Family Services that Richard

had sexually abused Y.E. and that Khaldia was aware of this situation, but had done nothing to

address it.  (Dantowitz Decl., Ex. A ("ORT Intake Report") 2-3; Pls.' 56.1 ¶ C3).  Later that day,

ACS caseworker Alison Chauvet went to Khaldia's home to determine whether the children

faced any immediate risk.  (Dantowitz Decl., Ex. B ("Investigation Notes") C0011-12).  In an

interview apparently conducted by Chauvet, Khaldia expressed shock at the allegations and told

Chauvet that she completely trusted Richard around their children and would never say anything

negative about his parenting.  (*Id.*).  Khaldia also stated that she suspected the report came from

an ex-girlfriend of Richard's, who had called Khaldia and warned her to watch out for him.

(Investigation Notes C0012).

During her visit, Chauvet also interviewed Y.E., the older child, who had purportedly

been abused by Richard.  Y.E., who was eight years old at the time, denied that Richard had

touched her inappropriately.  (*Id.*).  She stated that when Richard bathed them, however, he made

them put their fingers in their crotches and then smell them to make sure that they were clean.

(*Id.*).  At the end of the interview, Chauvet observed a mark near Y.E.'s knee; Y.E. told her that

Richard had caused the mark by hitting her with his belt.  (*Id.*).  Chauvet then interviewed J.E.,

the younger child.  (*Id.*).  J.E. stated that Richard had never touched her inappropriately, but that

6

he was at times mean and at other times nice.  (*Id.*).  Chauvet observed that both children were well-groomed and appeared to be in good health.  (*Id.*).

After Chauvet's initial assessment, ACS Caseworker LaToya Griffin was assigned to the case.  (Pls.' 56.1 ¶ C6).[2]  There is some dispute between the parties about when Griffin first met Khaldia.  Griffin maintains that their first meeting occurred when she visited the Emanuel residence, at which time she requested that Khaldia and the children come to the Brooklyn Child Advocacy Center (the "BCAC") so that all three of them could be interviewed regarding the allegations against Richard.  (Pls.' 56.1 ¶ C8; Dantowitz Decl., Ex. X ("Griffin Depo.") 96-98, 179-80; *see also* Investigation Notes C0014-15).  Khaldia denies that she met Griffin before going to the BCAC; indeed, she states that she was not home when Griffin visited her residence, and that her only interaction with Griffin before visiting the BCAC was when she called Griffin after Griffin left a business card with Khaldia's landlord.  (Pls.' 56.1 ¶ C8; Decl. Pls.' Opp'n Defs.' Three Mots. Summ. J. & Listing Evidence Submitted (Docket No. 122) ("Young Decl."), Ex. 28 ("Khaldia Aff.") ¶¶ 10, 13, 15).  According to Khaldia, at no point during that call did Griffin indicate an interest in interviewing Y.E. and J.E.  (Khaldia Aff. ¶¶ 4, 16).

In any event, on March 16, 2010, Richard drove Khaldia, Y.E., and J.E. to the BCAC for an interview with Griffin.  (Pls.' 56.1 ¶ C9).  Richard did not stay for the interview.  (*Id.*).  At some point prior to Khaldia's March 16th trip to the BCAC, the Kings County District Attorney's Office was informed of the accusations against Richard and the case was referred to the New York Police Department ("NYPD") for further investigation; NYPD Detective Joseph

---

[2]     "LaToya" is misspelled in the Complaint and the case caption.  For purposes of this Opinion, the Court adopts the spelling used in Defendants' Rule 56.1 Statements.  (*See, e.g.*, City Defs.' Local R. 56.1 Statement Material Facts Not In Dispute (Docket No. 117) ("City Defs.' 56.1") ¶ 6).

Sallustio was assigned to the case.  (*Id.* ¶¶ C10-11).  Upon arriving at the BCAC on March 16th,

Khaldia was asked to wait in a room while the children were placed in a separate location within

the BCAC.  (*Id.* ¶ C15).  Shortly thereafter, Sallustio and Griffin jointly interviewed J.E. and

Y.E.  (Investigation Notes C0017-19; Dantowitz Decl., Ex. F ("NYPD Case Notes") C0527).

Sallustio maintains that he would have sought permission from Khaldia before interviewing Y.E.

and J.E.  (Pls.' 56.1 ¶ C16; Dantowitz Decl., Ex. W ("Sallustio Depo.") 121-22).  Khaldia,

however, asserts that no one asked her for permission to interview the children.  (Khaldia Aff.

¶ 5).  Sallustio and Griffin took notes during the interviews with both children, but the interviews

were not videotaped.  (*See* Investigation Notes C0017-19; NYPD Case Notes C0527, C0529;

Griffin Depo. 113, 189).

Sallustio and Griffin first interviewed Y.E., who stated that Richard regularly bathed her

and that when doing so he washed her entire body, including her genitals, with a washcloth.

(Investigation Notes C0017-18; NYPD Case Notes C0527).  She also reported that he rubbed

lotion on her entire body — her "arms, legs, stomach, back, shoulders, butt and . . . [genitals]."

(NYPD Case Notes C0527).  Y.E. reported that Richard was dressed when he bathed her and that

she had never seen his genitals.  (Investigation Notes C0018; NYPD Case Notes C0527).  Griffin

recorded two additional relevant details.  First, she noted that Y.E. had stated that Richard would

break Y.E.'s jaw if someone from the police or ACS tried to talk to him about what Y.E. had just

told Griffin and Sallustio.  (Investigation Notes C0018).  Second, Y.E. stated that Richard was a

"bad toucher" because he touched her genitals, although it is not clear from the notes whether

those words were Y.E.'s or the interviewers' or whether Y.E. intended the words to have an

especially negative connotation when used to describe her father.  (*See id.*).

Sallustio and Griffin next interviewed J.E., who provided a similar report about how Richard bathed her.  (NYPD Case Notes C0529; Investigation Notes C0019).  J.E. also stated that Richard had made her give him a massage that involved putting lotion on his genitals.  (Investigation Notes C0020; NYPD Case Notes C0529).  According to the notes taken by Griffin, J.E. stated that this had happened "a lot of times."  (Investigation Notes C0020).  At either Griffin or Sallustio's request, J.E. drew a picture of one of these massages.  The picture showed a smaller figure reaching toward the groin area of a larger figure.  (*Id.*; NYPD Case Notes C0529).  At some point after J.E.'s interview — the notes are not exactly clear — Y.E. told Griffin and Sallustio that her sister was lying about having applied lotion to her father's genitals.  (Investigation Notes C0022).

After interviewing the children, Sallustio and Griffin interviewed Khaldia.  Khaldia stated that she knew that Richard gave baths to both children, but that she was not aware of any time he had put lotion on their genitals.  (NYPD Case Notes C0531).  Griffin and Sallustio recounted J.E.'s story about the massages and showed Khaldia J.E.'s picture.  (*Id.*).  Khaldia stated that she was concerned about the picture but that she did not believe J.E.'s story or that the events depicted in the drawing had taken place.  (*Id.*).  The following day, Richard came to the BCAC for an interview with Sallustio and Griffin.  (*Id.* at C0534).  He acknowledged bathing the children, but insisted that he had never applied lotion to their genitals.  (*Id.*).  He also categorically denied that he had allowed J.E. to apply lotion to his genitals.  (*Id.*).

**B.  Proceedings Against Richard and Khaldia**

On March 26, 2010 — ten days after the initial interviews at the BCAC — ACS personnel, including Griffin and Defendant Bertha Stallings (Griffin's supervisor at the time), convened a meeting to inform Richard and Khaldia that they would be filing an abuse petition

against Richard and seeking a corresponding protective order.  (Dantowitz Decl., Ex. C ("ACS Progress Notes") C0069-71; *id.*, Ex. Y ("Stallings Depo.") 56; Pls.' 56.1 ¶ C7).  Three days later, on March 29, 2010, Defendant John Mattingly, as Commissioner of ACS, filed the petition and application for a protective order in Kings County Family Court.  (Pls.' 56.1 ¶ C30; Initial Pet.).  Khaldia and Richard were not present; Y.E. and J.E. were represented by a Legal Aid attorney.  (Pls.' 56.1 ¶ C31; Dantowitz Decl., Ex. I).  That same day, the Family Court issued a temporary protective order that barred Richard from any contact with Y.E. and J.E., subject to court-ordered visitation sessions.  (Dantowitz Decl., Ex. J ("Temporary Protection Order")).  The original protective order lasted until April 12, 2010.  (*Id.*).  Richard appeared in court on April 1, 2010, and did not object to continuing the protective order.  (Pls.' 56.1 ¶¶ C34-C35; Dantowitz Decl., Ex. K).  The protective order was subsequently extended, first until June 23, 2010, and then until February 9, 2011.  (Pls.' 56.1 ¶¶ C37, C39).  Richard's attorney was present for both extensions, and Khaldia's attorney was present for the second extension.  (*Id.* ¶¶ C36, 38).  The temporary protective order was reduced to writing on July 8, 2010.  (*Id.* ¶¶ C32-C40).

On June 29, 2010, six days after the second extension of the protective order but before the order had been reduced to writing, Griffin made an unannounced visit to Khaldia's home, where she found Richard present in violation of the protective order.  (*Id.* ¶¶ C39, C40, C43; Dantowitz Decl., Ex. R ("August 12 Order")).  Griffin reported the violation of the protective order to the NYPD.  (Pls.' 56.1 ¶ C44).  When, the following week, the temporary protective order was reduced to writing, Griffin presented it to the NYPD and Richard was arrested for his June 29th violation of the order.  (*Id.* ¶ C46; Dantowitz Decl., Ex. Q).  Following the violation, ACS amended its abuse petition to include a charge of neglect by Khaldia for permitting Richard

to be around the children in violation of the protective order.  (Pls.' 56.1 ¶ C48; Dantowitz Decl., Ex. S ("Amended Pet.")).

Meanwhile, pursuant to a court order, ACS referred Y.E. and J.E. to Defendant Dr. Donald Lewittes, a psychologist, for an interview and expert opinion on whether Richard had abused the children.  (Pls.' 56.1 ¶ C49; Dantowitz Decl., Ex. T).  Dr. Lewittes conducted interviews of Y.E. and J.E. on May 13, 2010, May 26, 2010, and July 7, 2010 — the gap between the second and third interview sessions apparently the result of an effort to honor Khaldia's request to delay the interview until J.E.'s summer vacation.  (Pls.' 56.1 ¶ L6).  In November 2010, in response to a request from Jessica Price, the ACS attorney working on the case, Dr. Lewittes provided ACS with a forensic evaluation report and outlined his observations and opinions based on his interviews with Y.E. and J.E. and case records provided by ACS.  (*Id.* ¶¶ L12, L14).  Dr. Lewittes's report noted that J.E. now denied that she had ever put lotion on her father's genitals and also denied that he had ever asked her to perform that action.  (Decl. David Bloom, Esq. Behalf Def. Donald J. Lewittes, Ph.D. Supp. Mot. Summ. J. (Docket No. 88) ("Bloom Decl."), Ex. K ("Lewittes Report") 4).

After several adjournments (caused in part by the case's transfer to a new judge, the appointment of a new ACS attorney, and a request from Khaldia), Family Court Judge Stewart Weinstein held a fact-finding hearing in June and July 2011.  (Pls.' 56.1 ¶¶ C52, L17-L20, L22).  ACS relied primarily on J.E.'s drawing as corroboration for the girls' statements to Griffin and Sallustio.  (*Id.* ¶ C51).  Dr. Lewittes did not testify, apparently because ACS made a strategic decision, in the wake of another family court decision that was critical of Dr. Lewittes's methods, not to risk letting the hearing become a referendum on Dr. Lewittes.  (*Id.* ¶¶ C50-C51, L22).  Following three days of hearings, Judge Weinstein dismissed the charges against both

Khaldia and Richard.  (Young Decl., Ex. 20 ("Family Court Decision") 1).  With respect to the neglect charge against Khaldia, he acknowledged that she had permitted Richard to violate the protective order, but concluded that Khaldia had not willfully or purposefully endangered the children.  (*Id.*).  Judge Weinstein found credible Khaldia's explanation that she had been unable to drive the children home from daycare because of an extreme case of vertigo, that she had called Richard only because she had no other option, and that she had never left him alone with the children.  (*Id.*).

With respect to Richard, Judge Weinstein noted that a child's out-of-court statement required corroboration to support a determination of abuse.  (*Id.* at 1-2).  Y.E. corroborated J.E.'s story about the baths, but she denied J.E.'s story about applying lotion to her father's genitals, and thus did not provide corroboration for J.E.'s allegations of abuse.  (*Id.*).  Judge Weinstein further concluded that while J.E.'s drawing could potentially serve as corroboration, it lacked sufficient indicia of reliability to serve as corroboration for J.E.'s statements underlying the petition.  (*Id.* at 2).  Defendants assert — and Plaintiffs have not contested — that Judge Weinstein found the drawing "open to interpretation."  (Pls.' 56.1 ¶ C53).  ACS appealed, but the Appellate Division affirmed Judge Weinstein's decision.  *See Matter of J.E.*, 949 N.Y.S. 2d 58 (App. Div. 2d Dep't 2012).  Richard and Khaldia filed notices of claim with the City on August 15, 2012.  (Pls.' 56.1 ¶ C60).  Seven months later, they commenced this case.  (Docket No. 1).

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  An issue of fact qualifies as genuine if the "evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 325. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

## DISCUSSION

Plaintiffs assert various claims against Defendants, including claims for malicious prosecution, false imprisonment, and failure to train or supervise under *Monell v. New York City*

*Dep't of Social Services*, 436 U.S. 658 (1978), which the Court will consider in turn.  In keeping

with their Rule 56.1 statement, however, Plaintiffs also appear to assert several claims that are

either wholly conclusory or entirely undeveloped.  With a few exceptions, addressed below,

those claims are meritless and do not require further consideration.  *See Davis v. New York*, 316

F.3d 93, 100 (2d Cir. 2002) ("[C]onclusory statements or mere allegations [are] not sufficient to

defeat a summary judgment motion.").  The end result is that Defendants' motions for summary

judgment are granted and Plaintiffs' complaint is dismissed in its entirety.

**A.  Malicious Prosecution Claims**

The Court begins with Richard's and Khaldia's claims for malicious prosecution.  Those

claims are based on the abuse petition and protective order filed against Richard and the

subsequent neglect petition filed against Khaldia for permitting Richard to have contact with the

children notwithstanding the protective order.  Although Plaintiffs' filings are not especially

clear, they appear to bring malicious prosecution claims against all individual defendants.  (*See*

SAC ¶¶ 50-62, 139-142).  Out of an abundance of caution, the Court construes Plaintiffs'

malicious prosecution claims to have been brought against all Defendants.

The Court begins with Richard's and Khaldia's Section 1983 and New York state law

malicious prosecution claims against Griffin, Sallustio, and Stallings.  Under New York law, to

prevail on a claim for malicious prosecution, a plaintiff must show "(1) the commencement or

continuation of a . . . proceeding by the defendant against the plaintiff, (2) the termination of the

proceeding in favor of the accused, (3) the absence of probable cause for the . . . proceeding and

(4) actual malice."  *Smith-Hunter v. Harvey*, 712 N.Y.S.2d 438, 441-42 (2000) (internal

quotation marks omitted); *accord Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir.

2000).  To prevail on their Section 1983 claim, Plaintiffs must also show "in addition to the

elements of malicious prosecution under state law, that there was (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Id.* A party not in control of a prosecution may nevertheless be liable for "continuing" a malicious prosecution so long as the individual "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Id.* at 217 (quoting *DeFilippo v. Cnty. of Nassau*, 583 N.Y.S.2d 283, 284 (N.Y. App. Div. 2d Dept. 1992)).

Significantly, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003); *accord Colon v. City of N.Y.*, 60 N.Y.2d 78, 82 (1983). "In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (quoting *Pandolfo v. U.A. Cable Sys. of Watertown,* 568 N.Y.S.2d 981, 982 (App. Div. 4th Dep't 1991)); *see also Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) (noting that the relevant inquiry is whether the defendants had "probable cause to believe that [the plaintiff] could be successfully prosecuted"). It is a more exacting standard than the standard required to support an arrest. *See Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013). "'[P]robable cause for malicious prosecution purposes is assessed in light of facts known or reasonably believed at the time the prosecution was initiated." *Carthew v. Cnty. of Suffolk*, 709 F. Supp. 2d 188, 201-02 (E.D.N.Y. 2010) (internal quotation marks omitted). Thus, in order to survive summary judgment, Plaintiffs must raise a genuine issue of fact as to whether a reasonable person in a Defendant's position would have believed that the charges against Richard and Khaldia could be successfully prosecuted at the time the charges were initiated.

Applying those standards here, Plaintiffs' claims against Griffin, Sallustio, and Stallings must be dismissed.  The Court begins with Richard's claims.  As noted, he was charged with abuse based on J.E.'s statement that, on multiple occasions, Richard had her pull down his pants and rub lotion on his genitals.  (Initial Pet. C0379-80).  The petition also noted J.E.'s drawing in which she purportedly depicted herself putting lotion on Richard's genitals. (*Id.* at C0379).  Although the allegations with respect to Y.E. were sparser, the petition did note that Y.E. had told Griffin and Sallustio that Richard had rubbed lotion on her genitals and that he could, on occasion, be too rough with her.  (*Id.* at C0380).  The petition also noted Y.E.'s statement that Richard would get angry if he found out that she had told anyone about his actions.  (*Id.*).

Those facts plainly sufficed to establish probable cause to bring a petition against Richard.  Defendants could have reasonably believed that J.E.'s statements, her corresponding drawing, and Y.E.'s statements about Richard applying lotion to her genitals were sufficient to support a successful abuse petition against Richard.  In addition, Y.E.'s statement that Richard would be angry if he knew what she had told Griffin and Sallustio could reasonably have been viewed as further evidence supporting the charges insofar as they reflected a consciousness of guilt.  *Cf. Gottlieb*, 84 F.3d at 518-20 (2d Cir. 1996) (finding that similar facts — namely, a child's report of molestation and statement that the father did not like tattletales — provided "a reasonable basis for believing" that a father should be separated from his children and, therefore, that there was no substantive due process violation based on the father's separation).  Moreover, although Y.E. later denied that J.E. had been abused, Y.E. did state that Richard had rubbed lotion on her genitals and that he was a "bad toucher" (Investigation Notes C0018) — although as noted earlier, the import of that phrase to Y.E. is not entirely clear on the present record.

The Court's conclusion is further supported by the Family Court's finding of "good cause" to issue a protective order against Richard.  (Temporary Protection Order 1).  In a malicious prosecution case under New York law, "the issuance of a temporary injunction or similar judicial recognition of the merit of the underlying case creates a presumption of probable cause and places upon the plaintiff the burden of pleading facts sufficient to overcome it." *Butler v. Ratner*, 619 N.Y.S.2d 871, 874 (App. Div. 3d. Dep't 1994); *see Hornstein v. Wolf*, 67 N.Y.2d 721, 723 (1986).  In this case, Plaintiffs do not even come close to rebutting the presumption.  It goes without saying that neither Judge Weinstein's ultimate dismissal of the petition nor the Appellate Division's affirmance of that outcome requires a contrary conclusion. Were it otherwise, the second and third elements of a malicious prosecution claim would be duplicative in most cases.  *See, e.g.*, *Broughton v. State*, 37 N.Y.2d 451, 457 (1975).

In arguing otherwise, Plaintiffs contend that Defendants' actions were taken in bad faith and that they did not honestly believe that probable cause existed.  (Mem. Law. Opp'n Summ. J. Mots. (1) City Defs., (2) Gena Diacomanolis, and (3) Donalad Lewittes.  (Docket No. 135) ("Pls.' Mem.") 9-10, 24-25).  Plaintiffs' assertions, however, are entirely unsupported.  For example, they assert that Sallustio "aggressively questioned" J.E., thereby eliciting her statements of abuse.  (*Id.* at 9).  But Plaintiffs provide no evidence even suggesting that Sallustio acted improperly, much less that his actions amounted to bad faith or that he knew J.E. was lying.  (*See id.* at 10 ("Griffin, Stallings and Sallustio knew that there was inadequate evidence. Disputed question of fact for the jury, issue recited that when the child sex abuse petition was filed, they knew they had no case, without corroboration.").  Plaintiffs' uncited reference to J.E. calling Sallustio the "mean man" certainly does not suffice to show malice, let alone the absence of probable cause.  (*Id.* at 21).  In short, ignoring "mere speculation," *Hicks v. Baines*, 593 F.3d

159, 166 (2d Cir. 2010), there is no triable issue of fact as to the existence of probable cause to support the petition against Richard. *See Stansbury*, 721 F.3d 84, 95 (2d Cir. 2013) ("Ignoring frivolous allegations, the documented record establishes uncontroverted facts that, taken together, provided probable cause.")

The Court turns then to Khaldia's claim. As noted, Khaldia was charged with neglect after she permitted Richard to be around the children on June 29, 2010, in violation of the temporary protective order. (Pls.' 56.1 ¶¶ C43, C48). Richard, however, admitted to violating the protective order, and Khaldia has nowhere disputed that his contact with the children violated the order. (August 12 Order 1). Her knowing violation of the Court's order is thus sufficient to constitute probable cause for the ACS petition against her. After all, at the time the petition was brought, Richard had a sexual abuse petition pending against him (which the Court has already determined was supported by probable cause). Defendants were thus amply justified in believing that there was probable cause to bring a neglect petition against Khaldia. *Cf. Jaegly v. Couch*, 168 Fed. App'x 480, 482 (2d Cir. 2006) (summary order) (holding that the apparent violation of protective order arguably supported charges based on that violation, thereby defeating a claim for malicious prosecution on qualified immunity grounds). For the same reasons discussed with respect to Richard, Khaldia's unsupported assertions of Defendants' bad faith and dishonesty are insufficient to raise a genuine issue of fact on the question of probable cause. *See Stansbury*, 721 F.3d at 95.

Plaintiffs' claims also fail because there is no evidence of actual malice on the part of Griffin, Sallustio, or Stallings. Although Plaintiffs assert that the City defendants "knew at commencement (or should have known) they had no case and documented false evidence" (Pls.' Mem. 9), their assertion is supported with nothing more than "'conclusory statements [and] mere

allegations,'" which, of course, "will not suffice to defeat a summary judgment motion." *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)). For example, Plaintiffs assert that that "all . . . available evidence" supporting other theories "was withheld from the ACS attorney" prior to her filing the case in which Plaintiffs ultimately prevailed and that Griffin, Sallustio, and Stallings knew they had "inadequate evidence." (Pls.' Mem. 9-10). But Plaintiffs provide no evidence in support of their assertions. The closest they come to pointing to a specific piece of evidence is the retention of Dr. Lewittes to provide a validation session (*see id.* at 11), but the retention of an expert is patently insufficient to raise a genuine issue as to whether Defendants knew or believed their case to be deficient.

The presence of probable cause is equally fatal to Plaintiffs' claims against the other individual Defendants — Dr. Lewittes, Mattingly (the Commissioner of ACS, (SAC ¶ 12)), Cassandra Chandler (who became Griffin's supervisor after Stallings left ACS, (Pls.' 56.1 ¶ C59)), and Gena Diacomanolis (the Senior Director of the BCAC, (Pls.' 56.1 ¶ D4)). *Stansbury*, 721 F.3d at 94-95. But Plaintiffs' claims against those Defendants fail for an additional reason: There "is simply no evidence that [any of them] played an active role in the prosecution, or encouraged or importuned the" state to act. *Rothstein v. Carriere*, 373 F.3d 275, 294 (2d Cir. 2004). With respect to Dr. Lewittes, the evidence to which Plaintiffs point — Dr. Lewittes's contract with ACS, the fact that Dr. Lewittes and Griffin had each other's contact information, and the amount of time that Dr. Lewittes billed to this case (See Pls.' Mem. 15-16) — does not support the proposition that Dr. Lewittes in any way encouraged the case against Plaintiffs. At most, it suggests that Dr. Lewittes had the opportunity and means to contact Griffin, but that falls far short of "specific facts showing that there is a genuine issue for trial" on

the issue of whether he encouraged or supported the prosecution. *Matsushita*, 475 U.S. at 587 (emphasis and internal quotation marks omitted). Meanwhile, the only allegation of personal involvement on the part of Chandler, Mattingly, and Diacomanolis is that they failed to set standards that would have prevented "false fabricating evidence." (Pls.' Mem. 10). But such conclusory allegations do not suffice to survive summary judgment. *See, e.g.*, *Anyanwu v. City of N.Y.*, No. 10-CV-08498 (AJN) (THK), 2013 WL 5193990, at *8 (S.D.N.Y. Sept. 16, 2013) (dismissing claim against the same Mattingly because "the record contains no other admissible evidence that Mattingly actually knew about any violations" and failed to intervene to correct them); *Hallock v. Bonner*, 567 F. Supp. 2d 334, 339 (N.D.N.Y. 2008) (granting summary judgment because the record was "devoid of any evidentiary support" that defendants created a relevant custom or policy, or acted negligently in their supervisory roles).

For the foregoing reasons, Plaintiffs have failed to raise a triable question of fact on their malicious prosecution claims against all Defendants. Accordingly, Defendants' motions for summary judgment on Plaintiffs' malicious prosecution claims are granted.

## B.  False Imprisonment Claims

Next, the Court turns to Plaintiffs' false imprisonment claims.[3]  To prevail on a false imprisonment claim under New York law, a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks v.*

---

[3]      Plaintiffs' memorandum blurs the line between claims for false arrest and false imprisonment. As noted in the Court's earlier opinion in this case, claims for false arrest and false imprisonment under New York Law are analyzed identically and, thus, there is no meaningful difference for present purposes. *See Emanuel v. Griffin*, No. 13-CV-1806 (JMF), 2013 WL 5477505, at *3 n.3 (S.D.N.Y. Oct. 2, 2013); *see Posr*, 944 F.2d at 96; *Jacques v. Sears, Roebuck & Co.*, 30 N.Y.2d 466, 473 (1972). As Plaintiffs were never arrested, the Court will treat their allegations as claims for false imprisonment.

*Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003) (quoting *Broughton*, 37 N.Y.S. 2d at 456).  In

analyzing those factors, a court "must ask whether, under the particular circumstances presented,

a reasonable person would have believed that he was not free to leave if he did not respond to the

questions put to him."  *Pinto-Montoya v. Mukasey*, 540 F.3d 126, 131 (2d Cir. 2008) (internal

quotation marks omitted).  Here, Khaldia appears to assert a false imprisonment claim against

Griffin and Sallustio based on her purported detention at the BCAC (SAC ¶ 147; Pls.' Mem. 28);

Y.E. and J.E. assert false imprisonment claims against all Defendants based on the time they

were separated from Khaldia at the BCAC (SAC ¶ 147); and, liberally construing the Complaint,

Richard appears to assert an independent false imprisonment claim based on the time during

which the temporary protective order prohibited him from contact with J.E. and Y.E.  (Pls.'

Mem. 25-26; SAC ¶¶ 177-78).  The Court will address each Plaintiffs' claims in turn.

### 1. *Khaldia*

First, Khaldia's claim is without merit for the simple reason that she identifies no

evidence suggesting that she did not consent to the confinement.  *See, e.g.*, *Neighbour v. Covert*,

68 F.3d 1508, 1511 (2d Cir. 1995) (holding that going to a police station voluntarily at the

request of an officer was not a seizure); *see also Cellamare v. Milbank, Tweed, Hadley &*

*McCloy LLP*, No. 03-CV-39, 2003 WL 22937683, at *8 (E.D.N.Y. Dec. 2, 2003) (holding that

there was no false imprisonment where the plaintiff was not forced to stay at an interview and

was not told she was not free to leave).  Khaldia acknowledges that she voluntarily came to the

BCAC in response to Griffin's request for an interview.  (Khaldia Aff. 4-5; *see* Griffin Aff. 179-

80; Pls.' 56.1 ¶ C8).  And she does not show — or even suggest — that she subsequently

revoked her consent to be interviewed.  Khaldia does assert that once she arrived at the BCAC,

she was separated from her children, but nothing in the record suggests that she did not

voluntarily agree to leave the children in the playroom before proceeding to wait for her meeting

with Griffin and Sallustio.  (Khaldia Aff. 5).  Plaintiffs make much of the fact that Khaldia

waited for a long time at the BCAC.  (Pls.' Mem. 28; Khaldia Aff. 5).  But the mere fact that she

waited for an extended period of time does not indicate that she was confined against her will.

Similarly, there is no genuine dispute of fact as to whether "a reasonable person" in

Khaldia's position "would have believed that he was not free to leave."  *Kia P. v. McIntyre*, 235

F.3d 749, 762 (2d Cir. 2000) (internal quotation marks omitted).  Indeed, nowhere in Khaldia's

discussion of her visit to the BCAC does she assert that she was intimidated by the atmosphere at

the BCAC, much less that she believed she was not free to leave.  (*See* Khaldia Aff. 5-6).  Nor

does Plaintiffs' memorandum suggest that she would not have felt free to leave.  Plaintiffs point

to several photos supposedly indicating that the police section of the BCAC was an

"intimidating" place.  (Pls.' 56.1 ¶ C12 (citing Young Decl. Exs. 10-13)).  But the mere fact that,

after voluntarily coming to the BCAC, Khaldia was taken to an area of the Center that resembled

a police station is insufficient to raise a genuine issue as to whether Khaldia believed that she

was not free to leave.  Were it otherwise, any person's voluntary visit to a police facility might

be enough to render that person seized.  *Cf. Neighbour*, 68 F.3d at 1511 (holding that going to a

police station voluntarily was not a seizure).  Khaldia also asserts that Sallustio was angry and

rude to her.  (Pls.' Mem. 28).  Even when viewed in the light most favorable to Plaintiffs,

however, Sallustio's alleged gruffness could not support a finding that Khaldia was seized.  *See,*

*e.g.*, *Albury v. J.P. Morgan Chase*, No. 03-CV-2007 (HBP), 2005 WL 746440, at *14 (S.D.N.Y.

Mar. 31, 2005) ("Plaintiff's reliance on the fact that Huebsch yelled at her and called her a liar,

while certainly not pleasant, does not rise to the level of false imprisonment.").  Finally, although

Khaldia asserts that she was not given access to her daughters and that they were interviewed

without her consent, those allegations relate to the false imprisonment claims of Y.E. and J.E., not *Khaldia*.  *Cf. K.D.* ex rel. *Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 216 (S.D.N.Y. 2013).  Accordingly, Defendants are entitled to summary judgment on Khaldia's false imprisonment claim.

### 2.   *Y.E. and J.E.*

Y.E. and J.E., by contrast, have introduced sufficient evidence to survive summary judgment on the question of whether they were "seized" during their interviews with Griffin and Sallustio.  There is no dispute that "the Fourth Amendment applies in the context of the seizure of a child by a government agency official during a civil child-abuse or maltreatment investigation."  *Kia P.*, 235 F.3d at 762; *accord Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 363-64 (S.D.N.Y. 2012).  Here, the minor plaintiffs — only five and eight years old at the time — were left in a room without their mother and questioned by two adults whom they did not know.  (Pls.' 56.1 ¶¶ C17-C21).  Defendants assert that they secured Khaldia's permission before doing so (City Defs.' Mem. 3), but Plaintiffs vigorously deny that (Khaldia Aff. 2-3), and the Court cannot resolve that dispute on summary judgment.  Given that, a reasonable jury could find that Y.E. and J.E. would have believed that they could not leave and that they had to answer Griffin and Sallustio's questions, even if they were not expressly instructed to that effect.  *See Phillips*, 894 F. Supp. 2d at 360 (noting that, in evaluating a false imprisonment claim, the court must place itself in the shoes of the person claiming to have been seized).

Nevertheless, Defendants are entitled to summary judgment on the basis of qualified immunity.  In order to decide whether a defendant is protected by qualified immunity, a court must engage in a two-part inquiry.  First, it asks whether "the facts, viewed in the light most favorable to the plaintiff, show that the [official's] conduct violated a constitutional right."

*Gilles v. Repicky*, 511 F.3d 239, 244 (2d Cir.2007) (internal quotation marks omitted).  Even if the plaintiff satisfies that requirement, "the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant[s'] alleged misconduct."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  In deciding whether the right at issue was "clearly established," a court asks "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful."  *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011); *see Phillips*, 894 F. Supp. 2d at 385; *see also Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (noting that "existing precedent must have placed the statutory or constitutional question beyond debate" (internal quotation marks omitted)).  "If the [defendants'] conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity."  *Gilles*, 511 F.3d at 244.

Significantly, neither the Supreme Court nor the Second Circuit has ruled on "what standard applies in the context of child abuse investigations to determine whether the seizure of a child is reasonable."  *Phillips*, 894 F. Supp. 2d at 364; *see Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 376 (E.D.N.Y. 2011).  Although probable cause is the standard that generally applies to seizures by state actors, the Second Circuit has recognized that the special circumstances involved in protecting children from abuse may justify a seizure in that context subject only to a "reasonableness requirement[]."  *Tenenbaum v. Williams*, 193 F.3d 581, 603 (2d Cir. 1999) (citing *O'Connor v. Ortega*, 480 U.S. 709, 720 (1987) (plurality opinion)); *accord Southerland v. City of N.Y.*, 680 F.3d 127, 157-58 (2d Cir. 2011).  Moreover, the Second Circuit has further instructed that courts must remain mindful of the fact that "protective service

caseworkers must choose between difficult alternatives" and that "summary judgment should

thus be readily available to these caseworkers in proper cases under the qualified immunity

doctrine." *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010) (internal quotation marks omitted).

In short, it is an open question in this Circuit whether state officials must have probable cause or

merely a reasonable suspicion that a crime has occurred prior to seizing a child as part of a child

abuse investigation.  *See, e.g.*, *Southerland*, 680 F.3d at 157-58.

  In light of that legal uncertainty, the Court concludes that a reasonable person in

Defendants' positions would not necessary have understood that his or her conduct was

unlawful.  The uncontroverted facts in this case show that Defendants interviewed Y.E. and J.E.

in response to (1) a call reporting abuse (ORT Intake Report 3; Pls.' 56.1 ¶ C3); (2) Y.E.'s

statement that her father hit her with a belt (Investigation Notes CB0012); and (3) Y.E.'s

statement that their father bathed them and required them to touch their genitals in his presence

(*Id.*).  That is more than sufficient to support the conclusion that it would be reasonable for

Defendants to seize the children for an interview, even without considering the special solicitude

for child abuse investigators for which the Second Circuit has called.  *See Cornejo*, 592 F.3d at

128; *cf. Phillips*, 894 F. Supp. 2d at 387 (holding that there is no clearly established right

precluding the seizure and interview of a child based *solely* on an anonymous report that the

child had been abused).  The fact that the seizure here involved an interview (and an interview to

which the children were brought by their mother no less) rather than the physical removal of a

child from school or from her parents' custody merely strengthens that conclusion.  *See Phillips*,

894 F. Supp. 2d at 364 (noting that "the Second Circuit cases addressing the reasonableness of a

child's seizure have all involved situations where the child was physically removed either from

the school or from the parents' custody," where there may be a stronger argument for a higher

standard of proof).  Accordingly, Y.E.'s and J.E.'s claims are precluded by the doctrine of

qualified immunity.[4]

### 3. *Richard*

The false arrest section of Plaintiffs' memorandum appears to state a claim based on an

alleged infringement of Richard's liberty interests, although it is unclear whether Richard is

asserting that claim merely as the fifth element of his Section 1983 malicious prosecution claim,

*see Rohman*, 215 F.3d at 215, or as an independent claim for false imprisonment.  (Pls.' Mem.

25-26).  If the former, then the claim fails given the presence of probable cause, as discussed

above.[5]  If the latter, the claim also fails because Richard has not alleged a Fourth Amendment

violation, much less identified evidence supporting a violation.  *See Rohman*, 215 F.3d at 215;

*Graham v. City of N.Y.*, 869 F. Supp. 2d 337, 355-56 (E.D.N.Y. 2012).  The Second Circuit has

held that a person may state a Fourth Amendment claim if he faces serious criminal charges and

he can "show some deprivation of liberty consistent with the concept of 'seizure.'"  *Burg v.*

*Gosselin*, 591 F.3d 95, 98 (2d Cir. 2010) (internal quotation marks omitted).  The Court is not

aware, however, of any authority holding that facing claims of child abuse, even when combined

with a temporary protective order, constitutes a "seizure" for the purposes of the Fourth

Amendment.  Moreover, Richard has not shown any "deprivation of liberty consistent with the

---

[4]      Plaintiffs also appear to state a claim derived from the allegedly unlawful imprisonment of Y.E. and J.E. caused by the protective order against Richard.  (SAC ¶ 147).  As discussed above, however, the protective order was supported by probable cause and probable cause is a complete defense to a claim of false imprisonment.  *See Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014).

[5]      For the same reason, to the extent that Richard brings a claim based on his arrest for violating the protective order (*see* Pls.' Mem. 39), that claim also fails.  That is, as discussed above, Defendants plainly had probable cause given Richard's undisputed violation of the protective order.  *See Winter v. Northrup*, 334 F. App'x 344, 346 (2d Cir. 2009) (summary order).

concept of 'seizure,'" *id.*, as he did not face any restrictions on his Fourth Amendment liberty interests other than perhaps a requirement that he appear in court — which by itself is insufficient to constitute a seizure.  *See, e.g.*, *Bissinger v. City of N.Y.*, Nos. 06-CV-2325 (WHP), 06-CV-2326 (WHP), 2007 WL 2826756, at *7 (S.D.N.Y. Sept. 24, 2007) ("[A] pre-arraignment summons and court appearance do not qualify as a seizure."); *see also, e.g.*, *Nieves v. McSweeney*, 241 F.3d 46, 55 (1st Cir. 2001) ("[I]f the concept of a seizure is regarded as elastic enough to encompass standard conditions of pretrial release, virtually every criminal defendant will be deemed to be seized pending the resolution of the charges against him.").

Nor does Richard's undisputed interest in family integrity transform the proceedings against him into a Fourth Amendment seizure.  (Pls.' Mem. 25-26).  That interest arises under the Fourteenth Amendment rather than the Fourth Amendment, *see Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999), and, therefore, does not constitute the type of additional restraint that could transform the duty to appear in court into a false imprisonment seizure, *see Graham*, 869 F. Supp. 2d at 355 ("The temporary orders of protection procured from the Family Court at the City Defendants' request did not constitute a seizure under the Fourth Amendment.  Although he was prevented from seeing his son, Graham was otherwise at liberty."); *id*. ("While they may have infringed on plaintiff's liberty interest in maintaining the integrity of his family, this is not the liberty of movement — physical freedom — that the Fourth Amendment protects.").  Thus, even taking Richard's allegations as true, he has failed to raise a claim for false imprisonment and Defendants are entitled to summary judgment.

## C.  Plaintiffs' Claims for Failure To Train and Supervise and *Monell* Claims

Finally, Plaintiffs' claims against Mattingly and Diacomanolis for failure to train and supervise and claims against the City of New York under *Monell*, 436 U.S. 658, must be

dismissed. Such claims are valid only if there is an underlying constitutional violation. *See, e.g.*, *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *id.* ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (holding that the liability of supervisory official under Section 1983 presupposes an underlying constitutional violation); *Murphy v. N.Y. Racing Ass'n*, 76 F.Supp.2d 489, 500 (S.D.N.Y. 1999) (holding that to state a valid Section 1983 claim under a theory of supervisory liability, the plaintiff must first show that the supervisor's subordinates actually violated the plaintiff's constitutional rights). Here, the Court has determined (above and below), as a matter of law, that there were no constitutional violations, with the *possible* exception of J.E. and Y.E.'s false imprisonment claims in violation of the Fourth Amendment.

As to J.E. and Y.E.'s false imprisonment claims, Plaintiffs fall woefully short of raising a genuine dispute of fact relating to any *Monell* claim. Indeed, Plaintiffs fail to introduce any competent evidence whatsoever suggesting that the possible seizure took place pursuant to a practice, policy, or failure to train on the part of the City or its employees. Nor have they shown that a City policy or practice was the "moving force" behind the potential violation. *Monell*, 436 U.S. at 694. Therefore, the mere fact that the minor plaintiffs may have been unlawfully seized is insufficient to survive summary judgment. *See Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011) (observing that a municipal office may not be held liable under Section 1983 for failure to train based on a single constitutional violation); *City of Oklahoma City v. Tuttle*, 471 U.S. 808,

841 (1985) (holding that "a single incident of unconstitutional activity is not sufficient to impose

liability under *Monell*, unless proof of the incident includes proof it was caused by an existing,

unconstitutional municipal policy, which policy can be attributed to a municipal policymaker"

(internal quotation marks omitted)).  Accordingly, Defendants' motions for summary judgment

on Plaintiffs' *Monell* claims and supervisory liability claims are therefore granted.

**D.  Plaintiffs' Remaining Claims**

Plaintiffs' remaining claims are all without merit and can be disposed of quickly.  First,

Plaintiffs' appear to assert a stand-alone constitutional violation based on Defendants' note-

taking policies and the failure to implement a policy requiring videotaping of all interviews.

(Pls.' Mem. 57-60).  Any such claim is frivolous.  Indeed, Plaintiffs cite no authority

establishing, or even contemplating, a constitutional right to have the interviews at issue

videotaped; nor is the Court aware of any such authority.  Second, Plaintiffs also appear to argue

that the note-taking procedures violated their procedural due process rights by delaying

resolution of the claims against them.  (Pls. Mem. 59).  Once again, Plaintiffs fail to submit any

authority or evidence suggesting that their procedural due process rights were implicated, let

alone violated.  Accordingly, this claim too is dismissed as frivolous.

Third, Plaintiffs' Complaint also asserts a claim for interference with family relations,

apparently based on Defendants' investigation into the Emanuel family and the protective order

against Richard.  (SAC ¶¶ 150-51, 185).  Plaintiffs' memorandum, however, does not defend the

family integrity claims advanced in the Complaint.  Accordingly, those claims are deemed

abandoned. *Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) (holding that were a

counseled party files a "partial response arguing that summary judgment should be denied as to

some claims while not mentioning others may be deemed an abandonment of the unmentioned

claims").  Moreover, even if the claims had not been abandoned, they would fail on the merits.
As noted, the Court has already determined that probable cause supported the proceedings
against Richard, and Richard has failed to introduce any evidence supporting a procedural due
process violation associated with the order of protection.  Accordingly, Defendants are entitled to
summary judgment on those claims as well.

Finally, the Second Amended Complaint, although hardly a model of clarity, could be
construed to assert violations of New York state law.  (*See, e.g.*, SAC ¶¶ 157-60, 180-83).
Plaintiffs' memorandum, however, does not respond to Defendants' argument that they are
entitled to summary judgment on all such claims.  (*See, e.g.*, City Defs.' Mem. 30-34).
Accordingly, these claims are also deemed abandoned.[6]  Nevertheless, the Court has reviewed
Plaintiffs' state law claims and they are wholly without merit, substantially for the reasons stated
in the City Defendants' memorandum.  For example, many of those claims are plainly untimely
as Plaintiffs did not file a notice of claim until August 15, 2012, well after the ninety day period
in which they had to bring their claims (other than their malicious prosecution claims, which
became ripe only after the charges were dismissed, but which fail for other reasons).  *See
O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 358 (1981).  Additionally, the City Defendants
appear correct that they are entitled to qualified immunity under Section 419 of the New York
Social Services Law given the absences of any evidence of bad faith.  *See Carossia v. City of
N.Y.*, 39 A.D.3d 429, 430-31 (App. Div. 1st Dep't 2007).

---

[6]     Plaintiffs do argue that Dr. Lewittes is not entitled to quasi-judicial immunity.  (*See* Pl.'s
Mem. 42-44).  But they fail to affirmatively defend their state law claims on the merits.

**E.  Motion To Strike Plaintiffs' Filings**

As noted, Plaintiffs' Rule 56.1 Statement was filed late and did not conform to this Court's rules.  Significantly, that was not Plaintiffs' only problematic submission.  A substantial portion of his memorandum of law — which was also filed late — was single-spaced in a blatant effort to circumvent the page limits set by the Court when it granted Plaintiffs' request to file excess pages, but limited that filing to sixty pages rather than the seventy-five that Plaintiffs' counsel had requested (*see* Docket Nos. 112-13).  On top of that, Plaintiffs' memorandum was in significant part incomprehensible, leaving Defendants' counsel and the Court to decipher the arguments made therein.  In light of those problems, Defendants move to strike Plaintiffs' filings or for any other relief that the Court deems appropriate, including sanctions.  (Mem. Law. Supp. Mot. To Strike (Docket No. 125) 1-2).

Because the Court has granted Defendants' motions for summary judgment in their entirety, Defendants' additional motion is moot to the extent that it seeks to strike Plaintiffs' submissions.  Nevertheless, the Court concludes that there is ample basis to impose sanctions on Plaintiffs' counsel.  Rule 16(f) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, impose sanctions for a party's failure to obey a pretrial order and that where such sanctions are imposed, "the court must" (absent special circumstances not present here) "order the party, its attorney, or both to pay the reasonable expenses . . . incurred because of any noncompliance with this rule."  In addition, the Court has inherent authority to impose sanctions for "disobedience [of] the orders of the [Court]," both within the "court and . . . beyond the court's confines."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *see Ashlodge, Ltd. v. Hauser*, 163 F.3d 681, 683 (2d Cir. 1998) (holding that whether to impose sanctions is left to the sound discretion of the district court).  Under either theory, sanctions are appropriate where an

attorney's conduct "prevent[s] the efficient prosecution of the case nearly every step of the way and . . . cause[s] the Court and [opposing] counsel to waste considerable resources." *Macolor v. Libiran*, No. 14-CV-4555 (JMF), 2015 WL 337561, at *2 (S.D.N.Y. Jan. 23, 2015).

That is the case here.  Plaintiffs' counsel's failure to follow the Court's rules and orders caused unnecessary hardship for both Defendants' counsel and the Court.  Further, as noted, the record makes clear that at least some of Plaintiffs' counsel's violations were knowing and intentional, such as his decision to single-space eleven of the last twelve pages of his memorandum of law so that it would appear to comply with the sixty-page limit set by the Court (*see* Docket Nos. 113, 118), even though doing so meant the memorandum violated Local Civil Rule 11.1's requirement that all filings be double-spaced (a requirement with which the first forty-seven pages of the memorandum complied).  Counsel's actions are especially vexing in light of the fact that the Court already sanctioned him once for his egregious conduct during discovery.  (Docket No. 69).  His continued failure to abide by the Court's rules and orders, and the corresponding costs imposed on Defendants' counsel and the Court, make further sanctions appropriate.

Accordingly, pursuant to Rule 16 of the Federal Rules of Civil Procedure as well as the Court's inherent authority, Plaintiffs' counsel is ORDERED to compensate Defendants' counsel for the fees and costs associated with bringing the motion to strike.  *See* Fed. R. Civ. P. 16(f)(2); *see also Mahoney v. Yamaha Motor Corp. U.S.A.*, 290 F.R.D. 363, 371 (E.D.N.Y. 2013) ("A court may . . . award attorney's fees when sanctioning a party under Fed. R. Civ. P. 16(f), though only for reasonable expenses incurred because of noncompliance with this rule."); *Uretsky v. Acme Am. Repairs*, No. CV-07-4688 (DLI) (SMG), 2011 WL 1131326, at *1 (E.D.N.Y. Mar. 28, 2011) ("Attorney's fees awarded [pursuant to Rule 16] must be related to the expenses incurred

as a result of the sanctioned misconduct.").  Although this is a more mild sanction than the Court could have imposed (for example, the Court would have been on firm ground ordering Plaintiffs' counsel to reimburse Defendants for the fees and costs associated with the extra work that his deficient filings required in preparing their reply memoranda of law), a harsher sanction to deter further misconduct is unnecessary given the outcome of Defendants' motions.

## CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment are GRANTED, and the Complaint is dismissed in its entirety.  Further, Defendants' motion to strike is DENIED as moot to the extent that it seeks to strike Plaintiffs' submissions and GRANTED to the extent that it seeks sanctions.  Within **one week** of the date of this Opinion and Order, Defendants' shall submit a joint statement listing the fees and costs incurred in bringing the motion to strike.  Plaintiffs' counsel shall have **one week** from the date on which Defendants submit their statement in which to file any opposition to the fees and costs claimed therein. Plaintiffs' counsel is cautioned that the failure to timely file an opposition in conformity with the Court's rules will result in Defendants' submission being deemed unopposed.

The Clerk of Court is directed to terminate Docket Nos. 87, 94, 106, and 123 and to close the case.  The Court retains jurisdiction to adjudicate the amount that Plaintiffs' counsel has to pay in sanctions.

SO ORDERED.

Date:  March 25, 2015
       New York, New York

JESSE M. FURMAN
United States District Judge